UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| GARY W. MUFFLEY, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | |
| ) | Case No. 4:12-cv-00148-TWP-WGH |
| ADVANCED METALS TECHNOLOGIES ) | |
| OF INDIANA, INC., ) | |
| ) | |
| Respondent. ) | |

## ENTRY ON PETITIONER'S MOTION FOR PRELIMINARY INJUNCTION

Petitioner Gary W. Muffley, as Regional Director of the Ninth Region of the National Labor Relations Board ("the Director"), has filed a motion for preliminary injunction (Dkt. 1) pursuant to Section 10(j) of the National Labor Relations Act ("the Act"). *See* 29 U.S.C. § 160(j). The Director seeks injunctive relief to preserve the status quo pending the National Labor Relations Board's ("the Board") prosecution of unfair labor practices against Respondent Advanced Metal Technologies of Indiana, Inc. ("AMT"). Charges under Sections 8(a)(1), (3), and (5) of the Act are currently pending before the Board against AMT. The Director seeks to enjoin AMT from engaging in conduct violative of Sections 8(a)(1), (3), and (5). *See* 29 U.S.C. §§ 158(a)(1), (3), (5). Section 10(j) gives the district court power to grant temporary relief or restraining order "as it deems just and proper." *Id.* On January 28, 2012, the Court conducted a hearing on the Director's request for injunctive relief, at which the Court heard testimony and took evidence. This Entry shall constitute the Court's findings of fact and conclusions of law and Order. The Director has shown that some relief under §10(j) is, in the terms of the statute, "just and proper" because the company's actions have had substantial effects is discouraging union activity.

## I. <u>BACKGROUND</u>

These factual findings rest on testimony and evidence presented during the injunction hearing and a review of the partial record in the administrative proceeding which was admitted in evidence. AMT is engaged in the business of metal and plastic milling and manufacturing of components. In late 2011, AMT acquired the failing MKM Machine Tool Company's ("MKM") facility, located in Jeffersonville, Indiana. For more than three decades, MKM had been a union shop and when AMT acquired the facility, MKM was operating under a collective bargaining agreement with the International Association of Machinists and Aerospace Workers ("the Union") that ran from October 2007 through October 2012. The parties do not dispute that AMT is a successor employer for the purpose of succeeding to MKM's bargaining obligation with the Union. Bob Wiese ("Mr. Wiese"), the acting business manager, and Hart Vogt ("Mr. Vogt"), the Chief Operating Officer of AMT, met with MKM employees on November 29, 2011, to inform the employees of the AMT takeover and changes that would occur. A letter explaining that AMT had purchased only a portion of MKM's assets, rejected all of MKM's contracts, customer, and supplier agreements, and rejected the collective bargaining agreement between MKM and the Union, was distributed to the employees. The letter concluded by stating that AMT recognized the hourly employees at MKM had been represented by a union and AMT agreed to honor any and all legal obligations, including their obligation to recognize the Union and commence bargaining.

After the letter was distributed and the employees were given time to read it, Mr. Wiese and Mr. Vogt emphasized that AMT was a new company and work rules, guidelines, working conditions, and procedures would change. They informed the employees that the workforce would be reduced, that each employee would be subject to a ninety day probationary period, and

gave an overview of the new benefits employees would receive. AMT invited all of MKM's former employees to apply to AMT. As promised, AMT negotiated new contracts with MKM's former customers and suppliers. AMT began its operations at the former MKM facility on December 5, 2011 with 124 employees, whereas MKM had employed 164. All 124 of AMT's employees had previously worked for MKM, including 107 bargaining unit employees.

**A.      Hiring Decisions and Workforce Reorganization**

AMT reorganized its workforce, most significantly the Quality Department and the Tool Crib. Mr. Hart testified that he viewed the Quality Department as excess not needed for the company, therefore severe cuts were made and department was restructured. One position that was specifically eliminated was the gauge calibration technician, previously held by David Mattmiller ("Mr. Mattmiller"), a union steward. The Tool Crib on the other hand, was where the plant's tooling was stored and the location where machine operators would retrieve the tools needed to perform their duties. Mr. Hart testified that under MKM, the Tool Crib was disorganized and could be eliminated as a separate department. The Tool Crib attendant, a position previously performed by Charles Wright ("Mr. Wright"), another union steward, was specifically eliminated. Instead of having an attendant on duty, Mr. Hart planned to organize the tool room, lock it, and require machine operators to retrieve tools themselves, accompanied by a supervisor. Neither Mr. Mattmiller nor Mr. Wright was hired by AMT and AMT maintains their former positions were eliminated when the workforce was restructured.

After about one month of operation, Mr. Hart determined that quality issues involving gauges could be better resolved by creating a new salaried position in the Quality Department. Because Mr. Hart considered it a unique position, he initially wanted to hire from outside AMT. However, Craig Meredith ("Mr. Meredith"), an AMT employee, was recommended and

subsequently hired for the post. The new position is entirely different than the job previously held by Mr. Mattmiller, because Mr. Meredith was expected to improve and design gauges, work with vendors, and handle gauge calibration. Mr. Mattmiller, on the other hand, dealt only with gauge calibration.

With respect to the Tool Crib, after Mr. Hart made physical improvements, he decided to create a salaried position that would be a tool "guru" who would talk to vendors and find tools to improve productivity. He spoke with the plant manager about the position and its requirements, and current AMT employee Kevin Kennedy ("Mr. Kennedy") was recommended for the job. Mr. Kennedy was described as having tooling, supervisory, and purchasing experience, which were desired qualities for the position. Mr. Hart testified this position has much more responsibility than the clerical-type position which had been held by Mr. Wright.

**B.     Policy Enactments and Bargaining**

On December 8, 2011, the Union made a demand for recognition. AMT recognized the Union and made plans to meet. AMT and the Union first met for bargaining on February 9, 2012. The Union proposed that AMT accept the old MKM contract along with a modest wage increase. AMT rejected the proposal and the parties discussed the duration of a new collective bargaining agreement. AMT repeatedly questioned whether the Union had majority support from the workforce. The parties discussed the new positions held by Mr. Meredith and Mr. Kennedy, but AMT refused to give detailed information about the positions. No decisions were reached at the session and the meeting ended after approximately three hours. The parties were scheduled to bargain again on February 22, 2012, but the Union cancelled because it felt no progress was being made. Around June 22, 2012, the Union contacted AMT to resume bargaining. Thereafter, bargaining resumed on July 25–26, 2012.

In the interim, AMT instituted several new policies without consulting the Union. These included: on January 5, 2012 AMT stopped providing free coffee and prohibited employees from wearing ear buds or headphones in the workplace; in March 2012 AMT adopted a new attendance policy; in May 2012 an AFLAC policy was made available; in April 2012, AMT removed the Union bulletin board; in June 2012 AMT announced creation of a temporary weekend crew, though this plan was never implemented. The Union filed numerous unfair labor practices, including challenging the unilateral policies listed above, on June 20, 2012. *See* Dkt. 1 (outlining unfair labor charges). On July 13, 2012, AMT offered to rescind any of the challenged policies practices. At the July 26, 2012 bargaining session the Union did not request that these specific policies be rescinded.

The Union also filed additional unfair labor practice charges alleging that AMT engaged in bad faith bargaining. AMT and the Union held bargaining sessions on July 25–26, 2012, as well as August 1, 15, and 28, 2012. At these bargaining sessions, AMT requested a three-way contract between AMT, the Union, and employees regarding the no strike clause and proposed that any breach by the Union would result in the collective bargaining agreement become null and void and there could be no Union representation for two years after a breach. Additionally, AMT asked that the Union elect rather than appoint representatives; provide proof of the Union's certification and majority support; and agree to a broad Management Rights clause that would allow AMT to make decisions, changes, and additions until a collective bargaining agreement was reached. The broad Management Rights clause was accompanied by "fair warning" that AMT would continue to make changes to the clause until an agreement was reached.

Moreover, on August 28, 2012, AMT instituted a "No Solicitation" policy that prohibited employees from wearing Union shirts or buttons. Though AMT would not compromise on the

5

"No Solicitation" policy during bargaining sessions, on November 27, 2012, AMT rescinded the policy.

Finally, the Union alleges that AMT is illegally withholding information. First, it requested and has not received the names of employees who volunteered for the temporary weekend shift. Because that shift was never implemented and because of privacy concerns, AMT would not produce the names of the volunteers without consent; only one volunteer consented. Second, the Union requested a comparison of the former (MKM) health plan, costs, benefits and the current (AMT) health plan, costs, and benefits. AMT has produced the information regarding the current health plan offered to employees, but is incapable of producing MKM's policy as it does not have the information in its possession.

The parties last met for bargaining on September 20, 2012. The meeting was cut short when AMT insisted on tape recording the session and the Union refused. On November 27, 2012, AMT advised the Union it would not insist that future sessions be tape recorded. The Federal Mediation and Conciliation Service has been contacted for assistance, but no dates for future bargaining have been scheduled.

**C.    Union Presence at AMT**

As previously mentioned, on December 8, 2011, the Union requested that AMT recognize the Union and begin bargaining to reach a new collective bargaining agreement. After the February 9, 2012 bargaining session, the Union mobilized at AMT. It held meetings, began handbilling, and provided union pins to employees. Specifically, the Union distributed a letter to members on March 10, 2012, that stated it was "exploring ways to restore to [members] the benefits [ ] lost when MKM went out of business" and "negotiating a new collective bargaining agreement with AMT." Joint Ex. 1, GC 15. The Union also distributed an explanation of "At

6

Will Employment" to employees. Finally, the Union distributed cards that asked employees to answer two "yes" or "no" questions: (1) "Do you want to remain in the Union and have the IAM represent you?" and (2) "Would you attend a meeting to discuss issues pertaining to AMT and MKM?" Joint Ex. 1, GC 17. These three documents were brought to AMT's attention, and on March 16, 2012, photocopies of the documents were posted to AMT's bulletin board with added handwritten notes from Mr. Wiese. These notes included the phrases "Not True!", "create unjustified fear," and "good employees get increases -- bad employees get unions." Joint Ex. 1, GC 15, 16. Mr. Wiese also filled out the card, answering "no" to the two questions, indicating that he did not want to remain in the union and have the IAM represent him and he would not attend a meeting to discuss issues pertaining to AMT and MKM. His "no" answer was signed on behalf of himself and "ALL AMT Employees." Joint Ex. 1, GC 17. A letter signed by both Mr. Vogt and Mr. Wiese accompanied the photocopies and was posted next to the Union's card on the bulletin board. The letter stated that the Union is spreading misinformation and pointed out that Indiana is a "Right to Work" state, meaning employees do not have to pay dues to a union. The letter went on to tell employees to "think carefully for your future in responding to the card distributed by the Union," after stating AMT believed the best course of action was dealing directly with employees, i.e., not the Union. Joint Ex. 1, GC 31. A week later, on March 23, 2012, the letter and photocopied documents were removed from the bulletin board.

      When MKM was in business, it maintained multiple bulletin boards on the plant floor. The boards were hung on racks, which were attached to shelving. The boards were used to post company information, federal and state regulations, and one bulletin board was used by the Union. In December 2011, an AMT employee removed the Union materials from the bulletin board. In April 2012, AMT restructured the plant floor and removed all of the bulletin boards.

Between December 2011 and April 2012, the Union had not posted any materials on a bulletin board within AMT's facility. AMT replaced the old bulletin board system with glass-enclosed, locked bulletin boards which were hung in the cafeteria. The only person with a key to the locked bulletin boards is the human resources director, Marketta Elliott. AMT refuses to provide the Union its own dedicated board, and there is no evidence before the Court that the Union has requested to use AMT's locked bulletin boards to post materials.

In May 2012, the Union sent Chris Bradley ("Mr. Bradley"), an organizer, to rally support for the Union at AMT. Mr. Bradley and others created fliers, handbills, and stood out in front of the facility and distributed them to willing employees. He tried to handbill every Tuesday from mid-May until the beginning of October 2012. When Mr. Bradley first handbilled on May 22, 2012, no employees accepted the handbills. The next week, Mr. Bradley distributed between 25 and 35 handbills, which represents the average amount of handbills distributed at later visits. During these handbill sessions, employees asked Mr. Bradley where the Union had been and what was the Union doing for employees.

On July 27, 2012, AMT held an employee meeting where it discussed the July 26, 2012 bargaining session. AMT distributed a list of 16 items, including the unilateral policies that the Union alleges are unlawful. AMT told employees that the Union did not want to give them benefits and that the Union had abandoned the employees. The Union held its own employee meetings on August 24 and September 13, 2012. Approximately 32 total people attended the first set of meetings on August 24, 2012. The employees in attendance did not want AMT to know they were involved with the Union. On September 13, 2012, only 13 people attended the meetings.

Throughout 2012, the Union had difficulty securing volunteers to serve as stewards. One employee, Donny Luther, had been a Union steward while employed with MKM. However, he was unwilling to serve as a steward under AMT for fear of reprisal. It was obvious to the work force that the employer was against the union and they were scared for their jobs and hesitant to get involved with the Union. Employees, including Matthew J. Nichols, declined union positions for fear of losing their jobs. One employee, Jennifer Mayfield, observed the impact the No Solicitation had on her co-workers. For example, when Ms. Mayfield offered a button which read "A Woman's Place is in her Union" her co-worker declined because of fear that she would lose her job. Some employees specifically referenced the postings from March 2012 and the No Solicitation policy enacted August 28, 2012 as justifying their fear.

**Procedural Posture**

The current Motion for Preliminary Injunction was filed by the NLRB on November 30, 2012. On January 7 through January 11, 2013, the parties began a hearing with an ALJ. The Union began presenting its case on the merits, but did not finish the case-in-chief. The hearing was recessed and scheduled to resume on February 11, 2013. This Court held a hearing on January 28, 2013, where it heard testimony and took evidence. The Court accepted the partial record from the administrative hearing into evidence. Additional facts will be incorporated as necessary.

## II. LEGAL STANDARD

The Seventh Circuit instructs that "[t]he familiar factors that courts reference in weighing the propriety of preliminary injunctive relief in other contexts—the lack of an adequate remedy at law, the balance of potential harms posed by the denial or grant of interim relief, the public interest, and the petitioner's likelihood of success on the merits of its complaint—apply to

requests for relief pursuant to section 10(j) as well." *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 286 (7th Cir. 2001). The Director is entitled to relief when:

> (1) the Director has no adequate remedy at law;
>
> (2) the labor effort would face irreparable harm without interim relief, and the prospect of that harm outweighs any harm posed to the employer by the proposed injunction;
>
> (3) "public harm" would occur in the absence of interim relief;
>
> (4) the Director has a reasonable likelihood of prevailing on the merits of his complaint.

*Id.* (quoting *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1567–68 (7th Cir. 1996)). The Director bears the burden of establishing the first, third, and fourth factors by a preponderance of the evidence. *Id.* The Court considers the factors on a sliding scale, that is, "the greater the Director's prospects of prevailing are, the less compelling need be his showing of irreparable harm in the absence of an injunction." *Id.* at 286–87. Importantly, it is not the Court's responsibility to rule on the merits of the Director's complaint; the "inquiry is confined to the *probability* that the Director will prevail." *Id.* at 287.

### III. DISCUSSION

As mentioned earlier, AMT is a successor employer to MKM. In successorship situations, unions and employees are particularly vulnerable. See, *Fall River Dyeing v. NLRB*, 482 U.S. 27, 39-40 (1987). The Director brings unfair labor charges against AMT under Sections 8(a)(1), (3), and (5). Section 8(a)(1) makes it unlawful to "interfere with, restrain or coerce employees" while they are engaged in the exercise of their rights protected by Section 7, which includes the right to self-organization and collective bargaining. 29 U.S.C. § 158(a)(1); *see* 29 U.S.C. § 157. Section 8(a)(3) makes it unlawful to discriminate in hiring, terminating employees, or changing terms or conditions of employment, on the basis of an employee's union

activities or sympathies. 29 U.S.C. § 158(a)(3); *Electro-Voice*, 83 F.3d at 1568. The employer's actions must be motivated by a desire to discourage membership to be unlawful. *Bloedorn*, 276 F.3d at 289. Section 8(a)(5) makes it unlawful for an employer to "refuse to bargain collectively with the representatives of his employees" subject to Section 9(a). 29 U.S.C. § 158(a)(5); *see* 29 U.S.C. § 159(a) (stating that representatives designated or selected for collective bargaining by the majority of employees in a unit are the exclusive bargaining representatives for all employees).

Specifically, the Director alleges that AMT: interfered with, restrained, and coerced employees in the exercise of their rights under Section 7 by interrogating employees about Union activities and disparaging the Union, Dkt. 1 at 11 ¶¶ 24, 13, 13, 15, 16(a); discriminated in hiring by refusing to hire Mr. Mattmiller and Mr. Wright for positions in January 2012 because they "formed, joined or assisted the Union and engaged in concerted activities, and to discourage employees from engaging in these activities," Dkt. 1 at 8 ¶ 17; "failed and refused to bargain in good faith with the Union as the exclusive collective-bargaining representative of the Unit" by implementing unilateral policies, undermining and disparaging the union, and bargaining with no intention of reaching an agreement, Dkt. 1 at 11 ¶¶ 22(c), 26.

**A.   Likelihood of Success on the Merits**

To satisfy the "likelihood of success" prong of the 10(j) analysis, the Director need not prove the underlying merits of the action by a preponderance of the evidence, but only that it has a "better than negligible" chance of success. *See Electro-Voice*, 83 F.3d at 1570.

The Court finds that the Director has not shown a better than negligible chance of success on the merits for AMT's alleged violation of Section 8(a)(3) regarding the refusal to hire Mr. Mattmiller and Mr. Wright. AMT contends that when it took over operations on December 5,

11

2011, it eliminated the positions previously held by Mr. Mattmiller and Mr. Wright. Approximately one month later, two new positions were created that, although initially advertised for, were fulfilled internally. The Director argues that "the testimony in the record supports a finding that [AMT] initially avoided hiring [Mr.] Mattmiller and [Mr.] Wright by leaving their jobs vacant until it became apparent, in January 2012, that [AMT] could no longer avoid filling the positions." Dkt. 30 at 5. However, the Director cites no evidence in the nearly 1,200 page record and multiple exhibits to support this statement. At the January 28, 2013 hearing, Mr. Vogt testified that in his view, the new company would run more smoothly if the workforce was restructured. He later decided his initial approach was not working, and new positions were created. On this issue, the Court finds Mr. Vogt's testimony credible. Although Mr. Mattmiller and Mr. Wright were active in the Union, the Director has not satisfied its burden before this Court to demonstrate a likelihood of success on the merits of this specific claim under Section 8(a)(3).

That said, the Court does find the Director has shown a better than negligible chance of success on the merits of its claims that AMT interfered with its employees' Union activities. The evidence shows that AMT, specifically Mr. Wiese, consistently disparaged the Union, discouraged Union membership, and sought to prevent employees from being active in the Union. Specifically, the "No Solicitation" policy and March 2012 postings illustrate AMT's unlawful actions. Although the "No Solicitation" policy was revoked and the March 2012 postings were removed after one week, the import of these actions was clear: the Union was not welcome at AMT. *See NLRB v. Overnite Transp. Co.*, 938 F.2d 815, 819 n.6 (7th Cir. 1991) (noting that coercive threats may be implied rather than stated expressly, and that courts must be sensitive to the "economic dependence of the employees on their employers, and the necessary

tendency on the former, because of that relationship to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear").

While Section 8(c) makes it clear that "[t]he expressing of any views, argument, or opinion, or the dissemination thereof . . . shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). The testimony of employees indicates that many felt Union membership or activity was viewed negatively by AMT management, or could result in termination. For instance, Mr. Wiese's written comments posted in March 2012 stated, "good employees get increases -- bad employees get unions" and the posting that employees should "think carefully about their future" when responding to the Union's questionnaire is troubling. In the Court's view, this goes beyond opinion and contains threats. Therefore, the Court concludes the Director has satisfied its burden by demonstrating a likelihood of success on the merits of its claim under Section 8(a)(1).

Similarly, the Court finds the Director has shown a better than negligible chance of success on the merits of its claim that AMT engaged in bad faith bargaining. The Director contends that AMT engaged in surface bargaining, that is, "merely going through the motions of bargaining" without the requisite good faith. *Overnite Transp. Co.*, 938 F.2d at 821. To support this claim, it points to AMT's conduct of "informing the union that it was not interested in a contract or having a union at its facility, proposing arbitrary duration clauses, demanding extensive unsatisfactory management rights, breach of agreement proposals, proposing a 'three party' contract, repeatedly question the union's majority support and condition its Recognition proposal on the union's demonstration of majority support." Dkt. 2 at 18. More importantly, AMT has also bypassed the Union by implementing several unilateral policies.

AMT essentially argues that because the Union did not ask AMT to rescind the unilateral policies, the policies are not unlawful. Further, AMT argues that the Court cannot judge the substance of AMT's bargaining proposals. *See H.K. Porter Co. v. NLRB*, 397 U.S. 99, 108 (1970) (stating that the Board cannot compel party agreement on bargaining terms). First, AMT's argument that the unilateral policies were bargained for, so are not unlawful, fails. While this fact may affect the Director's ability to show harm, it does not render the claim moot. *Milwaukee Police Assoc. v. Jones*, 192 F.3d 742, 748 (7th Cir. 1999). The NLRB has considered the following conduct to be indicative of bad faith: "delaying tactics, unreasonable bargaining demands, unilateral changes in mandatory subjects of bargaining, efforts to bypass the union, failure to designate an agent with sufficient bargaining authority, withdrawal of already agreed-upon provisions, and arbitrary scheduling of meeting." *Atlanta Hilton & Tower*, 271 NLRB 1600, 1603 (1984).

The Director has made the requisite showing of many of these factors, which shows the Court the Director has a better than negligible chance of success on the merits. For example, the evidence establishes that AMT implemented multiple unilateral policies, which were proper subjects of bargaining. Furthermore, AMT made bargaining demands that can be characterized as unreasonable, such as requiring a three-way contract between employees, AMT, and the Union when collective bargaining agreements are contracts between a union and employer only, as well giving the Union "fair warning" it would continue to make changes until an agreement could be reached and demanding that bargaining sessions be tape recorded. AMT has also suggested that bargaining sessions be held in Alabama, which could be characterized in the same vein as arbitrary scheduling. The Director also introduced evidence that AMT made attempts to bypass the Union by speaking to employees about Union participation and holding meetings

about bargaining sessions. While the Court makes no finding that the Director has established unlawful conduct occurred, the evidence does support the likelihood of success on this claim.

AMT's second argument also fails, because the Court considers the bargaining proposals as just one factor and does not pass judgment on the content. Finally, the Court need not focus solely on AMT's behavior at the bargaining table. *Overnite Transp. Co.*, 938 F.2d at 822. The Court views the bargaining behavior alongside AMT's statements to employees and the Union, which also supports the Director's claim of bad faith bargaining. The Court notes, however, that although the likelihood of success of the Union's claim that AMT has unlawfully withheld information is low, this one factor does not change the Court's determination that the Director has shown a likelihood of success on the merits of its Section 8(a)(5) claim.

**B.     Adequate Remedy at Law, Irreparable Harm, and Balancing the Harms**

The Director contends that interim relief "is necessary in order to avoid the irreparable harm that will result during the passage of time until the Board's final order issues in due course." Dkt. 2 at 19. As for the refusal to hire allegations under Section 8(a)(3), the Director argues that the interim employment of Mr. Mattmiller and Mr. Wright is necessary to prevent a chilling impact on the remaining employees. However, the Director relies on the same evidence used to support its argument for likelihood of success on the merits. *See Bloedorn*, 276 F.3d at 288 ("In appropriate circumstances, the same evidence that establishes the Director's likelihood of proving a violation of the NLRA may provide evidentiary support for a finding of irreparable harm."). As before, the Court does not find ample evidence to support irreparable harm to the Union and employees on the Section 8(a)(3) claim. Moreover, balancing the harm to the Union against the harm to AMT if the relief was granted, the Court finds AMT would be unduly burdened if forced to hire Mr. Mattmiller and Mr. Wright. These two men were never AMT

employees, and the original hiring decision is not being challenged. If the Court required AMT to hire Mr. Mattmiller and Mr. Wright, it would upset the status quo as opposed to returning to the status quo.

Nonetheless, the Court does find that AMT's coercive actions have or will cause irreparable harm in terms of employee support for the Union. This damage cannot be remedied by an eventual Board order. A union and workers find themselves in a "peculiarly vulnerable position in the transition from predecessor to successor." *Bloedorn*, 276 F.3d at 298 (quotation omitted). Here, there is ample evidence on the record that employees do not feel comfortable participating in the Union for fear of discrimination. "The longer that an employer is able to chill union participation or avoid bargaining with a union, the less likely it is that the union will be able to organize and to represent employees effectively once the NLRB issues its final order." *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 500 (7th Cir. 2008). Therefore, the Court finds that the Director has shown the requisite harm for interim relief on its Section 8(a)(1) claim. Balancing this harm against the harm to AMT if interim relief was granted, the Court finds that AMT will not be damaged. AMT will still be free to express its opinions, but cannot communicate threats or coercive statements.

The Court finds that the Director has shown some evidence of irreparable harm regarding its Section 8(a)(5) claim. "[T]he greater the Director's prospects of prevailing are, the less compelling need be his showing of irreparable harm in the absence of an injunction." *Bloedorn*, 276 F.3d at 286. AMT argues that it has offered to rescind the unilateral policies, has rescinded the "No Solicitation" policy, and has rescinded its demand to tape record sessions. *See Jones*, 192 F.3d at 748 (holding that to grant a preliminary injunction after cessation of illegal activity, the "necessary determination is that there exists some cognizable danger of recurrent violation,

something more than the mere possibility which serves to keep the case alive" (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953))).

The Court agrees with AMT that its offer to rescind the policies cuts against the Union's claim of irreparable harm. However, the fact that AMT bypassed the Union in the first instance to implement the policies is evidence of failure to bargain in good faith, which is "likely to cause a myriad of irreparable harms." *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1191 (9th Cir. 2011). So far, AMT employees have been denied the economic benefits a collective bargaining agreement can secure, the loss of which is generally not addressed by Board decisions, nor would monetary damages make employees whole. *Id.* at 1191–92. Further, absent interim relief, nothing is stopping AMT from continuing to implement unilateral policies, making unreasonable demands of the Union, or engaging in surface bargaining. The Court finds that AMT's actions to this point indicate a risk that such behavior would continue. Balancing the harm the Union and employees face absent relief against the harm to AMT if relief is granted, the Court finds that AMT will not suffer unreasonable harm. Instead, AMT will be held to the standard of Section 8(a)(5), which is expected of all employers. However, the Court does not find the Union will face irreparable harm from AMT allegedly withholding requested information. The Union has not shown the Court that a Board order is inadequate to remedy AMT's action in this regard.

**C.     Public Interest**

In general, "[t]he public interest is furthered, in part, by ensuring that an unfair labor practice will not succeed because the board takes too long to investigate and adjudicate the charge." *Electro-Voice*, 83 F.3d at 1574. Here, the public interest is served by protecting the rights of AMT employees and by preventing AMT from engaging in behavior aimed at undermining union representation. The purpose of the NLRA would be served by an injunction

aimed at the unfair labor charges in this case under Sections 8(a)(3) and (5). *See Bloedorn*, 276 F.3d at 300 ("[T]he interest at stake in a section 10(j) proceeding is the public interest in the integrity of the collective bargaining process. That interest is placed in jeopardy when the protracted nature of the Board proceedings threatens to circumscribe the Board's ability to fully remediate unfair labor practices." (quotation and citation omitted)).

## IV. SCOPE OF INJUNCTIVE RELIEF

As an initial matter, the Court is fully aware that it's role is not to substitute for the Board's remedy, but simply to take steps necessary to avoid irreparable harm to the bargaining process and labor movement for employees of AMT. Accordingly, the Director has shown that partial injunctive relief under Section 10(j) is "just and proper" in this case. The Court is issuing an injunction prohibiting AMT from: (1) interfering with, restraining, or coercing employees in the exercise of rights to join or assist labor organizations, or to collectively bargain as found in 29 U.S.C. § 157; (2) acting unilaterally to change terms and conditions of employment for those in the bargaining unit; and (3) failing and refusing to bargain in good faith with the Union, pending final resolution of the unfair labor practices charges. This remedy does not include the reinstatement or hiring of Mr. Mattmiller and Mr. Wright, or an order to produce withheld information. Nor will the Court order AMT to rescind the unilateral policies identified in this Order upon request of the Union. The Union and AMT did belatedly bargain for the policies, and the Court sees no reason to include this relief.

The first element of the remedy is required to prohibit AMT from making statements or postings containing veiled threats about employee participation in the Union. Neither may AMT institute any policies preventing employees from openly displaying their Union paraphernalia,

assuming doing so does not violate legitimate safety policies, nor may AMT interrogate employees about Union activities.

The second element of the remedy is required to address the real possibility that AMT will continue its past practice of implementing unilateral policies that require Union bargaining. AMT must bargain with the Union to agreement or good faith impasse before making any changes to the terms of conditions of employment in the bargaining unit.

The third element of the remedy is necessary to require AMT to bargain in good faith with the Union over the terms of a new contract. This element encompasses much of the unlawful behavior, all of which is evidence of bad faith or surface bargaining. AMT is required to come to the table in good faith to bargain with the Union, including whether the Union is entitled to a bulletin board space at AMT.

## V. **CONCLUSION**

For the reasons set forth above, Plaintiff's Petition for Preliminary Injunction Under Section 10(j) of the National Labor Relations Act, As Amended (Dkt. 1) is **GRANTED** in part.

An appropriate injunction is therefore being entered effective immediately. AMT is **ORDERED** to display a copy of this ENTRY and the PRELIMINARY INJUNCTION in a location where employee notices are customarily posted, until the Board proceedings are completed.

SO ORDERED.

Date: 02/15/2013

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Charles P. Roberts, III
CONSTANGY, BROOKS & SMITH, LLP
croberts@constangy.com

Bradley J. Buchheit
HOSTETLER & KOWALIK, P.C.
bbuchheit@hklawfirm.com

Naima Rasheen Clarke
NATIONAL LABOR RELATIONS BOARD
naima.clarke@nlrb.gov

Theresa Lynn Donnelly Laite
NATIONAL LABOR RELATIONS BOARD
theresa.laite@nlrb.gov